IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

CONNIE M.,[1]
    Plaintiff,

v.    Civil No. 3:20-cv-00703 (JAG)

KILOLO KIJAKAZI,[2]
Acting Commissioner of Social Security,
    Defendant.

**REPORT AND RECOMMENDATION**

This is an action seeking review of the decision of the Commissioner of Social Security ("Commissioner") partially denying Plaintiff's application for disability insurance benefits and supplemental security income under the Social Security Act ("Act"). At the time of her alleged onset date, Plaintiff was a fifty-one-year-old former maid who was being treated for fibromyalgia, neuropathy, diabetes, high cholesterol, fatigue, sleep disturbance, and irritable bowel syndrome. (R. at 77-78, 136, 203, 227.) Plaintiff contends that her impairments render her unable to work. (R. at 207.)

On September 4, 2019, an Administrative Law Judge ("ALJ") found Plaintiff to have been disabled since August 29, 2019 but denied Plaintiff's application for disability benefits before that date. (R. at 29.) This matter comes before the Court for a Report and Recommendation pursuant

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), Acting Commissioner Kilolo Kijakazi should be substituted for former Commissioner Andrew M. Saul as the defendant in this matter.

1

to 28 U.S.C. § 636(b)(1)(B) on cross motions for summary judgment, rendering the matter ripe for review.[3]

Plaintiff now seeks review of the ALJ's decision, arguing that the ALJ erred in evaluating the opinion of Nurse Practitioner Jonathan Yoder ("Nurse Yoder"). (Pl.'s Br. Supp. Mot. Summ. J. 7, ECF No. 21 ("Pl.'s Mem.").) For the reasons set forth below, the Court RECOMMENDS that Plaintiff's Motion for Summary Judgment (ECF No. 20) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 22) be GRANTED and the final decision of the Commissioner be AFFIRMED.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for disability insurance benefits and supplemental security income on October 24, 2017, alleging disability beginning January 12, 2017. (R. at 14, 203-15, 220-28.) The Social Security Administration ("SSA") denied Plaintiff's claim on February 28, 2018 and again upon reconsideration on July 13, 2018. (R. at 145-65, 168-81.) Plaintiff requested a hearing before an ALJ, and a hearing was held on July 12, 2019. (R. at 38-76, 182-83.) On September 4, 2019, the ALJ issued a written opinion, holding that Plaintiff was disabled as of August 29, 2019, but denying Plaintiff's claim for benefits between January 12, 2017, the date of alleged onset, and August 29, 2019. (R. at 29.) Plaintiff requested review of the ALJ's decision (R. at 201), and on July 8, 2020, the SSA Appeals Council denied it and rendered the ALJ's

---

[3] The administrative record in this case remains filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these rules, the Court will exclude personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and financial account numbers from this Report and Recommendation, and will further restrict its discussion of Plaintiff's medical information only to the extent necessary to properly analyze the case.

decision as the final decision of the Commissioner. (R. at 1-7.) Plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g).

## II. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, a court will affirm the SSA's "disability determination 'when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence.'" *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (quoting *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012)). Substantial evidence requires more than a scintilla but less than a preponderance of evidence and includes the kind of relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996). Indeed, "the substantial evidence standard 'presupposes . . . a zone of choice within which the decision makers can go either way, without interference by the courts. An administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision.'" *Dunn v. Colvin*, 607 F. App'x. 264, 274 (4th Cir. 2015) (quoting *Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)).

To determine whether substantial evidence exists, the court must examine the record as a whole, but may not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)).

In considering the decision of the Commissioner based on the record as a whole, the court must take into account "whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact, if substantial evidence in

3

the record supports the findings, bind the reviewing court to affirm regardless of whether the court disagrees with such findings. *Hancock*, 667 F.3d at 476. If substantial evidence in the record does not support the ALJ's determination or if the ALJ has made an error of law, the court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

SSA regulations set forth a five-step process that the agency employs to determine whether disability exists. 20 C.F.R. § 404.1520(a)(4); *see Mascio*, 780 F.3d at 634-35 (describing the ALJ's five-step sequential evaluation). To summarize, at step one, the ALJ looks at the claimant's current work activity. § 404.1520(a)(4)(i). At step two, the ALJ asks whether the claimant's medical impairments meet the regulations' severity and duration requirements. § 404.1520(a)(4)(ii). Step three requires the ALJ to determine whether the medical impairments meet or equal an impairment listed in the regulations. § 404.1520(a)(4)(iii). Between steps three and four, the ALJ must assess the claimant's residual functional capacity, accounting for the most the claimant can do despite his physical and mental limitations. § 404.1545(a).

At step four, the ALJ assesses whether the claimant can perform her past work given her residual functional capacity. § 404.1520(a)(4)(iv). The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock*, 2012 U.S. App. LEXIS 128, at *3 (citation omitted). If such work can be performed, then benefits will not be awarded, and the analysis ends at step four. §§ 416.920(e), 404.1520(e). However, if the claimant cannot perform her past work, the analysis proceeds to step five, and the burden then shifts to the Commissioner to show that the claimant is capable of performing other work that is available in the national economy. § 404.1520(a)(4)(v).

### III. THE ALJ'S DECISION

The ALJ followed the five-step evaluation process established by the Act in analyzing Plaintiff's disability claim. (R. at 15-29.) *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (describing the ALJ's five-step sequential evaluation).

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity from her alleged onset date of January 12, 2017. (R. at 17.) At step two, the ALJ determined that Plaintiff suffered from the following severe impairments: "diabetes mellitus with diabetic neuropathy, non-obstructive coronary artery disease, irritable bowel syndrome, oropharyngeal dysphagia, and obesity." (R. at 17.) At step three, the ALJ determined that none of these impairments, individually or in combination, met or equaled a disability listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 19-21.)

The ALJ determined Plaintiff's residual functional capacity based on an evaluation of the entire record. (R. at 21-29.) Based on this evidence, the ALJ determined that Plaintiff retained the ability to perform light work with the following limitations:

> [S]he can occasionally climb ramps and stairs and never climb ladders, ropes, or scaffolds. She can occasionally stoop, kneel, crouch, and crawl. She must be allowed to alternate to standing for one to two minutes after every one hour of sitting. She must be allowed to alternate to sitting for three to five minutes after every 30 minutes of standing or walking.

(R. at 21.)

The ALJ explained that she determined Plaintiff's residual functional capacity after summarizing the evidence in the record and finding that the objective medical findings in the record did not support Plaintiff's claimed levels of severity. (R. at 21-26.) Based on her residual functional capacity findings, the ALJ concluded at step four that Plaintiff's limitations prevented her from performing any of her past relevant work. (R. at 26.)

At step five, the ALJ considered whether Plaintiff could perform jobs existing in significant numbers in the national economy. (R. at 27-28.) The ALJ weighed the testimony of the vocational expert, who opined that Plaintiff could perform the requirements of occupations such as small products assembler, electrical assembler, or parts assembler. (R. at 27-28.) The ALJ determined that, given Plaintiff's age, education, work experience, and residual functional capacity, Plaintiff could have made a successful adjustment to other work that exists in significant numbers in the national economy prior to August 29, 2019. (R. at 28.) Plaintiff's age category changed on August 29, 2019, and the ALJ concluded that a finding of "disabled" after that date was appropriate. (R. at 28-9.)

## IV. ANALYSIS

Plaintiff's appeal to this Court challenges the ALJ's finding of "not disabled" prior to August 29, 2019. She argues that the ALJ erred in evaluating the medical opinion evidence of Nurse Yoder. (Pl.'s Mem. at 7). Plaintiff contends that the ALJ's reasoning for finding Nurse Yoder's opinion unpersuasive was not supported by substantial evidence. (Pl.'s Mem. at 7). Defendant responds that the ALJ correctly evaluated the medical opinion evidence as part of her residual functional capacity assessment and pointed to substantial evidence in the record to support her findings. (Def.'s Mot. For Summ. J. and Br. in Supp. (ECF No. 22) at 15). For the reasons set forth below, the ALJ did not err in denying Plaintiff's application for benefits prior to August 29, 2019.

Under the SSA regulations, the ALJ must consider each medical opinion in the record. 20 C.F.R. §§ 404.1520c, 416.920c ("We will articulate in our determination or decision how persuasive we find all of the medical opinions . . . in your case record."). The regulations define a medical opinion as follows:

> A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the [following] abilities . . .
>
> (i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
>
> (ii) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
>
> (iii) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and
>
> (iv) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

*Id*. §§ 404.1513(a)(2), 416.913(a)(2). A medical opinion does not include "judgments about the nature and severity of [the claimant's] impairments, . . . medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis." *Id.* § 404.1513(a)(3) (defining these categories of information as "other medical evidence").

Under the regulations,[4] the ALJ must evaluate each medical opinion and articulate the "persuasiveness" of all medical opinions by considering five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) "other factors that tend to support or contradict the medical opinion[,]" including familiarity with the other evidence or understanding of disability program policies and requirements. *Id*. §§ 404.1520c, 416.920c(a), (b),

---

[4] Because Plaintiff filed her disability claim after March 27, 2017, Section 416.920c, which sets forth revised rules regarding the assessment of medical opinion evidence, applies here.

(c)(1)-(5). Supportability and consistency are the "most important" factors, and the ALJ must discuss how he considered these factors in the written opinion. *Id*. § 416.920c(b)(2).

For supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are," the "more persuasive the medical opinion []" will be. *Id*. § 416.920c(c)(2). Similarly, for consistency, "[t]he more consistent a medical opinion []" is with "evidence from other medical sources and nonmedical sources," the "more persuasive the medical opinion[]" will be. *Id*. § 416.920c(c)(2).

Under the substantial evidence standard of review, "even if the allegedly contradictory evidence Plaintiff highlights could support a different result, the court's role is not to second-guess the ALJ's findings." *Risner v. Comm'r Soc. Sec.*, No. 8:19-cv-00753, 2020 U.S. Dist. LEXIS 168482, at *28 (D.S.C. Apr. 20, 2020) (citing *Brown v. Colvin*, No. 5:15-0321, 2016 U.S. Dist. LEXIS 111237, at *6 (D.S.C. Aug. 22, 2016), *aff'd* 675 F. App'x 336 (4th Cir. 2017)).

The ALJ may explain her consideration of the other factors but is only required to do so when contrary medical opinions are equally persuasive in terms of both supportability and consistency. *See id*. § 416.920c(b)(3). In that situation, the ALJ must then articulate the remaining factors and their application to the persuasiveness of the medical opinion. *See id*.

> A. **Plaintiff's Treatment History with Nurse Yoder.**

Plaintiff has a history of type II diabetes mellitus since being diagnosed with the condition in 2001. (R. at 409.) She began treating as a new patient with Nurse Yoder in October 2016, when she reported that she had not taken diabetes medication for two years. (R. at 409.) At a November 11, 2016 appointment, she complained of fatigue, sleeping problems, "stabbing pain" in her legs,

8

and pain in her feet.[5] (R. at 405.) At her next appointment in February 2017, Plaintiff reported experiencing bilateral "electric shock" pain in her feet for the past several weeks and groin pain while standing. (R. at 399.) By May 2017, she complained of nerve pain without radiation that lasted ten to fifteen minutes at a time, "significant nighttime leg pain," and intermittent chest pain with exertion or stress. (R. at 395.) Nurse Yoder instructed her to take medication for her chest pain and to follow up for imaging. (R. at 396.) She was referred to a cardiologist and psychologist and told to resume her medications. (R. at 396-97.)

At her June 22, 2017 appointment, she told Nurse Yoder that she was experiencing intermittent chest and bilateral leg pain, shortness of breath, anxiety, muscle aches, and scattered itching. (R. at 393.) Nurse Yoder started her on medications to help her anxiety and skin lesions and increased her prescription dosage to treat her diabetic neuropathy. (R. at 394.) Upon follow up a month later, Plaintiff reported bilateral foot pain at night, some hand numbness, and bilateral shoulder pain and left upper extremity numbness in the morning. (R. at 390.) Nurse Yoder noted that Plaintiff did not go to Central Virginia Health Services to pick up the medication prescribed to her at her June 22, 2017 appointment. (R. at 390.) He refilled her prescriptions and advised her to follow up in two months. (R. at 391.)

On October 6, 2017, Plaintiff followed up and reported that her diabetes mellitus was "much better on current med[ications]." (R. at 387.) She continued to experience "diffuse muscular pain that limits her activity," but was "[t]rying to stay active [by] walking 15-20 min[utes] several times per day." (R. at 387.) She described her legs "jumping at night" and "[s]ome interior hip pain bilaterally [that] wakes her up at times." (R. at 387.) She noted decreased sleep "for several

---

[5] Both the October and November 2016 appointments occurred before Plaintiff's alleged onset date, January 12, 2017.

months" and occasional pain resulting from rib fractures she sustained twenty years ago. (R. at 387.) Nurse Yoder began to treat Plaintiff for fibromyalgia and prescribed her a muscle relaxer to help her sleep at night. (R. at 388.)

Plaintiff next saw Nurse Yoder on January 15, 2018, when she reported ongoing soft tissue pain, fatigue, difficulty sleeping, and urinary tract difficulties. (R. at 443.) Nurse Yoder started Plaintiff on a new medication for her diabetes but noted that she was stable with her hyperlipidemia regimen. (R. at 444.) He also noted that her treatment for fibromyalgia appeared to be "stable on current regimen," and that she denied shortness of breath, chest pain, dizziness, and fainting. (R. at 444.) Plaintiff returned to Nurse Yoder on May 7, 2018 and reported foot and toe pain, as well as "shooting pains up both legs to level of knee." (R. at 436.) She felt that these symptoms worsened when she walks. (R. at 436.) Additionally, Plaintiff complained of intermittent brief episodes of feeling tired and on the verge of fainting, which happen "[m]ostly at rest." (R. at 436.) Although she did not report ever having fainted, she told Nurse Yoder that she experiences difficulty breathing, she has no acute shortness of breath or excessive sweating with these episodes. (R. at 436.)

Plaintiff reported "disabling fatigue and total body pain problems" at an August 10, 2018 follow up appointment with Nurse Yoder, who declined to change Plaintiff's treatment protocol. (R. at 559-61.) He advised her to diet and exercise and to continue with her medications. (R. at 561.) Later, on November 19, 2018, Plaintiff again complained of "disabling fatigue and total body pain problems." (R. at 555.) She also told Nurse Yoder that she has been experiencing headaches for four weeks, which started shortly after waking up and lasted until bedtime. (R. at 555.) She reported sudden onset episodes of intercranial hypertension, which she described as her vision going dark, feeling confused, and possibly falling down. (R. at 555.) Nurse Yoder referred Plaintiff

to behavioral health services for her anxiety, intolerance to medicine, and fibromyalgia. (R. at 557.)

In February 2019, Plaintiff went to Nurse Yoder and reported her headaches had improved but worsened over the previous four days. (R. at 551.) During the prior two to three weeks, Plaintiff experienced blurry vision and right-sided headaches, ear pain, coughing, and morning mucous. (R. at 551.) He related her headaches to dental pain and recommended a follow up with dental care. (R. at 551.) Nurse Yoder that she had been forgetting to take her diabetes medication and was only eating once per day because of loss of appetite. (R. at 551.) He referred her to a diabetes educator to assist her with dietary self-management, and to ophthalmology to discuss her diabetes, blurry vision, and headaches. (R. at 553.) Upon examination, Plaintiff reported sensation in four out of five areas on her right foot, and five out of five areas on her left foot. (R. at 553.)

Treating again with Nurse Yoder on May 20, 2019, Plaintiff reported a cough and shortness of breath on exertion, which worsened when walking. (R. at 530.) She reported continuing pain in her knees and ankles, and stabbing pain in her first and second toes on left. (R. at 530.) She reported a stabbing sensation on the top of her right foot at night, frequent swelling in her knees and ankles from time to time, and hand tightness and jerking. (R. at 530.) Nurse Yoder started her on medication to help with her shortness of breath and counseled her on weight, diet, and exercise management. (R. at 531.)

On June 20, 2019, Plaintiff described left hip pain that worsened with sitting and driving, joint pain, shortness of breath on exertion, bilateral leg pain with intermittent sharp/electric pain below the knee, and involuntary leg jerking in the evening and at bedtime. (R. at 546.) Although medication helped with her shortness of breath, Nurse Yoder prescribed her an inhaler. Finally, on July 15, 2019, Plaintiff reported that her bilateral leg pain extended from her legs to her hips, with

11

intermittent sharp pain below the knee lasting for extended periods of time. (R. at 575.) Once again, her medication helped with her shortness of breath and she appeared to have limited improvement with better glycemic control. (R. at 576.)

      **B.**    **Nurse Yoder's Opinion.**

Nurse Yoder submitted a Fibromyalgia Residual Functional Questionnaire on November 11, 2017, which accounted for the period beginning October 11, 2016 through October 6, 2017. (R. at 419-22.) In his report, Nurse Yoder opined that Plaintiff experiences severe daily muscular pain that inhibits activities of daily living, particularly in her shoulders, arms, and hips. (R. at 420.) Stress, fatigue, and movement/overuse precipitate her pain, which is severe enough to frequently interfere with her attention and concentration. (R. at 420.) Nurse Yoder found that emotional factors contribute to the severity of Plaintiff's symptoms and functional locations, and she demonstrated a marked limitation in her ability to deal with work stress. (R. at 420.) Physically, he found that she could walk two city blocks without rest or severe pain, but does not need to elevate her legs with prolonged sitting or use a cane while walking. (R. at 420-21.) He opined that she can occasionally bend at the waist, and has no significant limitations in reaching, handling or fingering. (R. at 421.)

Although he did not have a clinical basis to determine to what extent she can continually stand and sit at one time, Nurse Yoder concluded that Plaintiff needs to have a job which allows her to shift positions at will from sitting, standing, or walking. (R. at 421.) He also did not have a clinical basis for determining how much Plaintiff can lift and/or carry in a competitive work situation, but ultimately concluded that Plaintiff cannot work an eight-hour day. (R. at 421.) He opined that her impairment and/or treatment would cause her to miss three days of work per month. (R. at 422.)

### C. The ALJ's Analysis of Nurse Yoder's Opinion.

The ALJ acknowledged that while Nurse Yoder treated Plaintiff multiple times, his examination notes failed to describe Plaintiff as having significant physical abnormalities, appearing uncomfortable sitting, standing, or walking, or restricted in her range of motion. (R. at 26, *passim*.) Aside from slight decreased sensation and diffuse muscle tenderness, neither Nurse Yoder's questionnaire responses nor his treatment offer insight into why he found Plaintiff unable to work an eight-hour workday. (R. at 26, 533.) The ALJ explained that the absence of significant physical abnormalities undermined Nurse Yoder's contention that Plaintiff was unable to work a complete eight hour-day. (R. at 26.) She noted that Plaintiff could attend regular medical appointments with Nurse Yoder and was able to do daily activities such as driving and grocery shopping. (R. at 26.) The ALJ concluded that Plaintiff is not as limited in her abilities to maintain attention, stay on task, remain in one position, or participate in activities requiring her to adapt to changes. (R. at 26.)

Substantial evidence in the record supports the ALJ in her analysis of Nurse Yoder's opinion. Although Nurse Yoder diagnosed Plaintiff with fibromyalgia, there is considerable overlap in his opinion and treatment notes as to whether Plaintiff's chronic pain was caused by complications from diabetes. (R. at 26, 530, *passim*.) For example, Nurse Yoder noted that the pain in Plaintiff's legs, feet, and toes "sound[ed] more like neuropathy" and noted fibromyalgia as a questionable diagnosis "given current [history]." (R. at 436.) Subsequently, Nurse Yoder ceased to assess Plaintiff for fibromyalgia in early 2019 and determined by June 20, 2019 that she was experiencing diabetic peripheral neuropathy associated with type II diabetes mellitus. (R. at 549.)

Acknowledging that these treatment notes came after Nurse Yoder's submitted opinion, the ALJ subsequently concluded that Nurse Yoder failed to offer sufficient support for his opinion that Plaintiff was as restricted as he opined. (R. at 26.)

In her January 5, 2018 Adult Function Report (R. at 258-65), Plaintiff noted that she was capable of caring for herself, cooking, washing dishes, doing the laundry, grocery shopping, crocheting, and socializing and dining out two to three times a week. (R. at 260-62.) Although Nurse Yoder estimated that Plaintiff could walk two city blocks at most, Plaintiff asserted she could walk about half a mile without stopping. (R. at 263, 420.) Notably, Plaintiff completed this report just a month and a half after Nurse Yoder submitted his questionnaire. (R. at 265, 422.) Additionally, Nurse Yoder submitted his report only a month after Plaintiff reported that her diabetes was improving with medication and she was actively trying to walk fifteen to twenty minutes several times a day. (R. at 387, 422.) The ALJ noted that other providers did not report deficiencies in Plaintiff's attention and concentration, nor did they observe her to be uncomfortable sitting, standing, or walking during examinations. (R. at 26.) Dr. Robert McGuffin ("Dr. McGuffin") physically examined Plaintiff in February 2018 and concluded that she could: (1) walk and sit about six hours in an eight-hour day; and (2) occasionally lift or carry twenty pounds. (R. at 86.) Further, Plaintiff was occasionally limited in stooping, kneeling, crouching, and crawling, but was found to have strength and range of motion within functional limits. (R. at 86.)

The ALJ found that Dr. McGuffin's opinion was shared by another consultative examiner, Dr. William Rutherford, Jr., who examined Plaintiff in July 2018. (R. at 24, 120.) Plaintiff also sought medical care in July 2018 at Spotsylvania Regional Medical Center, where she received treatment for chest pain. (R. at 465.) During her four days, she was noted to have full range of motion in her upper and lower extremities, full strength in her grip and bilateral biceps, and full

14

extension in her ankles and toes. (R. at 477). Plaintiff was found to be alert, oriented, in no acute stress, with a normal affect judgment and mood. (R. at 467.) Further, she denied problems with her gait, weakness, or confusion.

Although Nurse Yoder opined that Plaintiff had a marked limitation in dealing with work stress, and pain severe enough to interfere with her attention and concentration, the ALJ notes that her records do not demonstrate a meaningful increase in objective medical abnormalities due to stress. Plaintiff disclosed that she can pay attention for about two hours, follows written and spoken instructions "very well," and describes her ability to handle changes in routine as "good." (R. at 263-64.) In February 2017, Dr. Richard Milan ("Dr. Milan") opined that Plaintiff had non-severe anxiety that did not inhibit her ability to understand, remember, or apply information; interact with others; concentrate, persist or maintain pace; and adapt and manage herself. (R. at 97.) Dr. Howard Leizer agreed with Dr. Milan's assessments and conclusions on reconsideration. (R. at 116-17.)

Finally, in her hearing with the ALJ, Plaintiff testified that she drives herself to and from grocery stores and doctor's appointments, visits her daughter, and tries to walk for at least fifteen minutes a day. (R. at 47, 55, 57.) She told the ALJ that she can walk "[a]bout a city block" on a "good day," but on worse days she struggles to walk to the bathroom. (R. at 57.) Plaintiff lamented not being able to garden anymore because of the pain she experiences when walking and her inability to bend down for long periods of time. (R. at 62.) Aside from occasionally cooking, she vacuums once a week and does her own laundry once every two weeks. (R. at 63.)

The ALJ articulated that she found Nurse Yoder's opinion unpersuasive because it is not consistent with the evidence in the record, including Plaintiff's own disclosures. (R. at 26.) Because the ALJ's fact-finding is supported by substantial evidence, her evaluation of Nurse Yoder's opinion was not in error.

## V. CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 20) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 22) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to Senior United States District Judge John A. Gibney, Jr. and to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/ MRC
Mark R. Colombell
United States Magistrate Judge

Richmond, Virginia
Date: January 10, 2022